Jasen, J. (dissenting).
In my view, the five nonjudicial subpoenas duces tecum issued by the Organized Crime Task Force should be sustained.
The State-wide Organized Crime Task Force was created by the Legislature in 1970. (Executive Law, § 70-a.) The Legislature found that organized criminal activity conducted by efficient, disciplined and complex illegal organizations is a corrusive and corruptive influence on legitimate businesses and poses a significant threat to the welfare of the people of our State. (L 1970, ch 1003, § 1.) Moreover, these well-resourced conspiracies have spread throughout the State and Nation, thereby outreaching the efforts of local law enforcement officials who are confined by geographic jurisdiction and limited resources. (L 1970, ch 1003, §§ 2, 3.) To counter the danger to the peace and security of law-abiding citizens throughout the State, the Legislature established a task force, within the Office of the Attorney-General, whose sole purpose would be to investigate and prosecute those involved in organized criminal activity, in an effort to break the structure of organized crime and eliminate the power of the underworld.
In carrying out its statutory responsibilities, the Task Force, in January, 1974, commenced an investigation into the alleged "fixing” of horse races at Monticello Raceway in Sullivan County and at other New York State tracks. At the request of *236 the Sullivan County District Attorney, and with the approval of the Governor, a Grand Jury was impaneled in Sullivan County in February, 1974 and the Task Force began presenting evidence in April. During the course of this investigation, the Task Force received information from an informer that raceway officials had converted raceway funds for their personal benefit and had made political contributions with corporate funds in violation of the Election Law. Believing these allegations to be "threadbare”, the Task Force took no action. However, two days later, another informer furnished the Task Force with two letters from a hotel official who was also a member of the racing association board of directors. In one letter to the association, the official reported that the association had paid the bill for the bar mitzvah of the son of its president, Leon Greenberg. The hotel had since decided that this payment was "improper”, repaid the money, and announced that it would rebill Greenberg personally. In the second letter, the hotel official resigned his position on the board of directors. At the request of the Sullivan County District Attorney and in the belief that the first informer’s report had now been verified, the Task Force opened an investigation, collateral to that involving the horse race fixing, into the possibility that organized crime had infiltrated the management of the race track. Since the matter was not yet ripe for Grand Jury presentation, the Assistant Attorney-General in charge of the investigation issued an office subpoena, in accordance with subdivision 4 of section 70-a of the Executive Law, to the comptroller of the racing association seeking the production of association financial records bearing on all transactions over $2,500 during a five-year period. This office subpoena was partially complied with. As a result, documentary evidence was discovered which supported the allegation that illegal political contributions had been made by the association. Thereafter, the Assistant Attorney-General issued four additional office subpoenas directing certain racing association officials to produce specific financial records in their possession. Motions to quash all five subpoenas were granted by Special Term on the ground that the subpoenas failed to specify the nature of any alleged intercounty or interstate organized criminal activity. The Appellate Division unanimously affirmed. I would reverse the order of the Appellate Division and reinstate the subpoenas duces tecum.
The Legislature has specifically authorized the Deputy At *237 torney-General "to conduct hearings at any place within the state, to administer oaths or affirmations, subpoena witnesses, compel their attendance, examine them under oath or affirmation, and require the production of any books, records, documents or other evidence he may deem relevant or material to an investigation.” (Executive Law, § 70-a, subd 4.) The standards by which nonjudicial subpoenas are to be measured ar.e well established. The Legislature has the power to confer upon the Attorney-General, an executive officer, the power and duty to conduct investigations. While the Legislature may confer this discretionary authority, the discretion cannot be exercised in an "arbitrary and unbridled” manner. (Carlisle v Bennett, 268 NY 212, 217.) The Attorney-General, or his designate, must act in good faith, with the knowledge of and with a due regard for the principles of evidence. (Dunham v Ottinger, 243 NY 423, 433-434, app dsmd 276 US 592.) A statute cannot, and subdivision 4 of section 70-a of the Executive Law does not, authorize the Attorney-General to conduct a roving investigation for the purpose of "generally prying into the affairs of any person.” (Dunham v Ottinger, supra, p 433.)
On the other hand, since the Legislature has conferred a broad subpoena power upon the officer in charge of the Task Force, the office subpoenas issued here should be sustained if the information sought is relevant to a legitimate inquiry and if there is some basis for inquisitorial action. (Matter of A’Hearn v Committee on Unlawful Practice of Law of N. Y. County Lawyers’ Assn., 23 NY2d 916, 918, cert den 395 US 959.) At a preliminary stage of an investigation, such as is involved here, it is only necessary to establish that the records and books sought bear "a reasonable relation to the subject matter under investigation and the public purpose to be served.” (Myerson v Lentini Bros. Moving & Stor. Co., 33 NY2d 250, 256; accord Matter of La Belle Creole Int., S. A. v Attorney-General of State of N. Y.0, 10 NY2d 192, 196; Carlisle v Bennett, 268 NY 212, 217, supra.) Investigations would be paralyzed, if not aborted, if arguments into materiality and relevancy are transferred to a preliminary stage. "Only where the futility of the process to uncover anything legitimate is inevitable or obvious must there be a halt upon the threshold.” (Matter of Edge Ho Holding Corp., 256 NY 374, 382.)
In my view, the Task Force is not required to make a preliminary factual showing that the matter to which the office subpoenas are addressed involves either organized crime *238 or multicounty activities. That is precisely what the Attorney-General is attempting to determine by its investigation. If the Task Force officials were possessed of the facts which would establish the existence of either element, it would be unnecessary for them to conduct an investigation. The test is, and has always been, whether the materials sought relate reasonably to the subject matter investigated and to the public purpose to be served. (See, e.g., Myerson v Lentini Bros. Moving & Stor. Co., 33 NY2d 250, 256, supra; Matter of La Belle Creole Int., S. A. v Attorney-General of State of N. Y., 10 NY2d 192, 196, supra.) If there is a fair basis for an investigation, office subpoenas seeking pertinent information should be enforced.
The broad language of the statute would indicate that the Legislature had intended to give wide procedural latitude to the Task Force to bring to fruition the investigations conducted. A broad grant of subpoena and investigatory power is consistent with the legislative findings. The Legislature found that local county prosecutors were severely hampered in their efforts to investigate organized crime by their limited resources and by their restricted geographic jurisdictions. (L 1970, ch 1003, § 3.) It was recognized that evidence of criminal activity, particularly activity conducted by organized criminal associations, does not suddenly appear in the hands of investigators as a neatly wrapped package, with all the bows tied. Rather, a successful investigation requires weeks, months, and perhaps years, of painstaking research and ceaseless effort. The services of accountants, financial analysts, and other specialists may be required. Not until a substantial number of pieces are collected and put in place will the shape and dimensions of the total mosiac become clear. Organized crime goes to great pains and lengths, for rather obvious reasons, to conceal its presence. A criminal act that, on the surface, appears to be of an entirely local and unorganized nature gathers greater significance as further facts are unearthened and analyzed. The Legislature recognized that overworked, under-resourced local prosecutors cannot devote the time and money required to pursue this kind of intensive investigation. Even if they could, once the trail led out of their county, their efforts would be hampered by jurisdictional limitations. A State-wide unit, with broad investigatory powers, was needed in order to prosecute well-financed criminal associations who do not measure their activity by nice boundary lines.
In order that the valid and important public purpose of *239 checking organized crime be served, it is important that Task Force investigations not be cut off by the same arbitrary lines the Task Force was created to avoid. Where there is a fair basis for an organized crime investigation, the Task Force should be permitted to proceed. The alternative, of course, in the event that the Task Force is prevented from investigating, is for the local District Attorney to investigate on his own. He has an absolute right to summon any witnesses and their records before a Grand Jury. (CPL 190.50, subd 2; 610.20, subd 2.) However, to require the local prosecutor to conduct organized crime investigations, at least during the preliminary stage, is to defeat the legislative purpose and to read back into the law the same arbitrary limitations that frustrated investigations before.
This is not to say that individual citizens are at the mercy of the Task Force. In accordance with the case law that has developed over the years, the Task Force must establish, upon a motion to quash, that the materials sought relate to the subject matter investigated and to the public purpose to be achieved. However, that is all the Task Force need do. To require definitive proof of jurisdictional elements is to require an impossibility.
The majority reaches its conclusion that a preliminary factual showing of the jurisdictional elements must be made only by "balancing the interests of the Deputy Attorney-General * * * and * * * the interests of witnesses in their legitimate protection” (p 232). I believe that authority for a judicial weighing of interests is sorely lacking. The statute certainly does not confer it. Our case law, designed to guard against fishing expeditions conducted by roving commissions, does not require it.
The majority also contends that the sole recourse of the witness, absent its holding, would be to invite and risk a criminal prosecution for failure to obey a subpoena (p 232). However, it is well established that the recipient of an office subpoena can go into court and challenge it "on the ground it calls for irrelevant or immaterial documents or subjects the witness to harassment”. (Myerson v Lentini Bros. Moving & Stor. Co., 33 NY2d 250, 256, supra; accord Matter of A’Hearn v Committee on Unlawful Practice of Law of N. Y. County Lawyers’ Assn., 23 NY2d 916, 918, supra.) "If through ignorance or intention”, the Deputy Attorney-General abuses his subpoena power, "the victim of his illegitimate and oppressive *240 attempt not only will be immune under the statute from punishment for refusing to submit to his unreasonable requests or questions but can always appeal to the courts for protection.” (Dunham v Ottinger, 243 NY 423, 434, app dsmd 276 US 592, supra.) In this very case, there was no criminal prosecution for disobedience of the command of a subpoena. Rather, the recipients of the subpoenas moved in court, as is their right, to quash the subpoenas. Prospective witnesses are always free to obtain this kind of judicial review. Hence, the protection that the majority deems necessary to bestow upon prospective witnesses is totally unnecessary.
I believe that the subpoenas issued in this case were relevant to a legitimate purpose. I also conclude that there was a fair basis for the inquisitorial action. The Task Force, with the approval of the Governor and the local District Attorney, had been investigating possible organized crime involvement in the alleged fixing of horse races at the Monticello Raceway. The legitimacy of this investigation is not challenged. In the course of the investigation, the Task Force learned of wrongful acts allegedly committed by officials involved in track management. The acts complained of included the siphoning off of corporate money for private gain and the giving of illegal corporate political contributions. Given the asserted presence or organized crime in other areas of track operation and the nature of acts allegedly committed by the track management, it was reasonable for the Assistant Attorney-General to conclude that organized crime may very well be playing a role in the management of the track.
I would also note that the presence of intercounty activity is indicated by the fact that the allegedly illegal political contributions were made to one State-wide political organization, as well as to political associations located in several other counties. Thus, there was sufficient cause to believe that criminal activity of a possibly organized nature was not confined to Sullivan County and was not purely of a local character. The financial records sought bear a reasonable relation to the matters' under investigation and to the public purpose to be served. It is relevant that the local District Attorney gave his approval of the collateral investigation, even though such approval is not necessary for the issuance of a nonjudicial office subpoena by the Deputy Attorney-General. (Compare Executive Law, § 70-a, subd 4 with Executive Law, § 70-a, subd 7.)
*241 There can be little doubt that the presence of organized crime is often not readily detectable. Indeed, it is this very imperceptibility that heightens the danger that these criminal associations pose to legitimate society. The Organized Crime Task Force was created because extensive and painstaking investigation is needed to root out this subversive element. The majority’s decision ignores both established precedent and the evidence contained in the record. The State’s laudable effort to bring organized crime under control has been struck a totally unnecessary blow. I believe that the office subpoenas were properly issued and comply satisfactorily with the standards set forth in our cases. For the reasons stated, I would reverse the order of the Appellate Division and sustain the subpoenas.
Chief Judge Breitel and Judges Wachtler and Fuchsberg concur with Judge Jones; Judge Jasen dissents and votes to reverse in a separate opinion; Judges Gabrielli and Cooke taking no part.
Order affirmed, without costs.